IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL, | § § § § § | No. 139, 2019 |
| Plaintiff Below, Appellant, | § § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | C.A. No. K17A-09-001 |
| MCGINNIS AUTO & MOBILE HOME SALVAGE, LLC, | § § § | |
| Defendant Below, Appellee. | § § § | |

Submitted: December 11, 2019
Decided: February 20, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, Justices; and **NEWELL**, Chief Judge,* constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED** in part, and **REVERSED** in part.

Ralph K. Durstein III, Esq., Department of Justice, Dover, Delaware, *Attorney for Plaintiff-Appellant State of Delaware Department of Natural Resources and Environmental Control.*

John W. Paradee, Esq., Daniel F. McAllister, Esq., Stephen A. Spence, Esq., Brian V. DeMott, Esq., BAIRD MANDALAS BROCKSTEDT, LLC, Dover, Delaware *Attorneys for Defendant-Appellee McGinnis Auto and Mobile Home Salvage, LLC.*

──────────────────────

*Sitting by designation under Del. Const. Art. IV § 12.

**SEITZ**, Chief Justice, for the majority:

McGinnis Auto & Mobile Home Salvage, LLC salvages discarded and dilapidated mobile homes on its property in Kent County, Delaware. According to the Department of Natural Resources and Environmental Control, a large and unsightly waste pile, possibly contaminated with asbestos, had accumulated over time. DNREC cited McGinnis for environmental violations and for operating a reclamation facility without a permit. DNREC gave McGinnis a chance to bring the property into compliance. McGinnis failed to do so. DNREC responded by issuing a cease and desist order. In addition to other actions, the cease and desist order required McGinnis to remove the waste pile from the property in an environmentally responsible manner.

McGinnis appealed the order to the Environmental Appeals Board. It argued that DNREC could order the illegal activity to stop, but could not order McGinnis to take affirmative action to remove the waste pile from the property. The EAB agreed with McGinnis, finding that the order exceeded the scope of its authority. The Superior Court affirmed the EAB's decision, finding that DNREC did not have the authority under its cease and desist power to require McGinnis to remove the waste pile, direct how the waste must be removed, or demand documentation.

On appeal, DNREC contends that the EAB and Superior Court took too cramped a view of DNREC's cease and desist authority. We agree. When, as here,

2

the presence of a waste pile is a violation, it follows that the only way to cease and desist from the violation is to remove the contaminated debris from the site. With two exceptions, we also uphold the other requirements of the cease and desist order.

I.

McGinnis operates a business that dismantles and salvages material from mobile homes. In February 2015, DNREC officers inspected McGinnis's facility and observed a large pile of solid waste composed of framing lumber, plastics, insulation, metal, degraded wood or soils, and wire. DNREC noted that McGinnis violated 7 *Del. C.* § 6003(a)(4) and Rule 4.1.1.1—collecting, storing, and processing waste, and operating a solid waste facility without a permit—and 7 *Del C.* § 6025(b)(2)—disposing of solid waste in a facility without a permit.[1] In August 2015, DNREC issued McGinnis a Notice of Violation requiring McGinnis to submit a plan to remove the waste pile and to apply for a Resource Recovery Facility Permit application within 90 days.[2] The following month, McGinnis responded with a disposal plan and agreed to remove the waste pile by July 2016, but never applied for a permit.

---

[1] 7 *Del. C.* § 6003(a)(4) ("No person shall, without first having obtained a permit from the Secretary, undertake any activity: [i]n a way which may cause or contribute to the collection, transportation, storage, processing, or disposal of solid wastes . . . ."); 7 *Del. Admin. Code* § 1301-4.0, Rule 4.1.1.1 ("No person shall engage in the . . . operation . . . of a solid waste facility . . . without first having obtained a permit from the Department."); 7 *Del C.* § 6025(b)(2) ("No person shall cause or contribute to the disposal or discharge of solid waste . . . except: [i]n solid waste disposal facilities which have received a permit from the Department.").

[2] App. to Opening Br. at A012-13.

3

In March 2016, DNREC conducted a follow-up inspection of McGinnis's property. Although McGinnis removed some waste from the pile, it did not document proper disposal procedures or estimate the volume removed. DNREC officers thought any waste removal was negligible and, in fact, more waste had been added to the pile. And in June 2016, DNREC advised McGinnis of possible asbestos in the mobile home debris. It imposed a deadline to cleanup and remove the waste pile.

McGinnis did not remove the waste pile, continued violating statutory and regulatory requirements, and ignored DNREC's formal notifications. Finally, in August 2016, DNREC through its Secretary issued a cease and desist order under 7 *Del C.* § 6018, which required McGinnis to:

(1) cease and desist receiving and dismantling mobile homes and construction and demolition waste;

(2) remove, within thirty days, all solid wastes including, but not limited to, discarded mobile homes and piles of construction and demolition waste on land and in containers;

(3) complete the above-referenced requirements in compliance with all applicable laws and regulations, and only utilize transportation companies, disposal facilities, and contractors holding valid permits;

(4) provide, within thirty days, written documentation confirming the proper disposal or recycling of the solid wastes;

(5) provide, within thirty days, a list of all mobile homes received by McGinnis since 2001, the date received, the vehicle identification number, and date of manufacture;

4

(6) provide, within thirty days, a detailed explanation of inspection, handling, storage, disposal, and recycling procedures for all materials removed from, or contained within, mobile homes; and

(7) apply, within thirty days, for a Resource Recovery Facility permit if McGinnis desired to operate its facility.[3]

McGinnis appealed the Secretary's order to the EAB claiming that DNREC exceeded its authority under § 6018 because paragraphs (2) through (6) functioned as mandatory injunctions, a remedy within the sole discretion of the Court of Chancery.[4]  DNREC responded that its authority should be broadly interpreted as equivalent in scope to that of the Court of Chancery.  The EAB held that, while § 6018 authorized the Secretary to proscribe conduct, the Secretary lacked "adequate legal authority" to order "affirmative injunctive relief" by way of a cease and desist order.[5]  According to the EAB, other means exist to compel compliance with the affirmative mandates.  The cease and desist order was the improper enforcement mechanism.  Thus, paragraphs (1) and (7) were within DNREC's authority, but paragraphs (2) through (6) were not.[6]

On appeal, the Superior Court agreed and found that the ordinary meaning of "cease" and "desist" limited the Secretary's power to ordering a violator to stop

---

[3] App. to Opening Br. at A028-29.
[4] Even though McGinnis denies that it committed any violation, on appeal the parties assume the violations occurred and only argue the scope of DNREC's authority under § 6018.  *See* Answering Br. at 1-2; App. to Answering Br. at B001.
[5] *McGinnis Auto & Mobile Home Salvage, LLC v. Del. Dep't of Nat. Res. and Envtl. Control*, EAB Appeal No. 2016-08 (Aug. 8, 2017); App. to Opening Br. at A047.
[6] *Id*.

particular actions.[7]  The Superior Court also found that other statutory provisions controlled DNREC's cease and desist authority when DNREC required the violator to take "affirmative corrective action."[8]  Because § 6018 contains no express authorization for the Secretary to order affirmative corrective action, the court found that the "General Assembly demonstrated its intent to limit DNREC's authority under Section 6018 to prohibiting conduct."[9]  Thus, the Superior Court affirmed the EAB's judgment because the order required affirmative action.  DNREC appeals again, and because McGinnis did not cross-appeal the EAB decision, only paragraphs (2) through (6) of the Secretary's order are at issue on appeal.

## II.

Our review of the EAB's decision matches that of the Superior Court—whether the decision is supported by substantial evidence and is free from legal error.[10]  Our decision involves an issue of law—the scope of DNREC's cease and desist authority under the statute—which we review *de novo*.[11]

The Delaware General Assembly enacted the Environmental Control Act to require, among other things, proper "solid waste storage, collection, transportation,

---

[7] *Del. Dep't of Nat. Res. and Envtl. Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 2019 WL 851935, at *5 (Del. Super. Feb. 21, 2019).
[8] *Id.*
[9] *Id.*
[10] *Stoltz Mgmt. Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del. 1992).
[11] *City of Lewes v. Nepa*, 212 A.3d 270, 273 (Del. 2019).

6

processing and disposal."[12]  DNREC's Secretary is responsible for enforcing the provisions of the Act.[13]  According to the Act, our Court must give the statute a liberal construction to achieve its purposes.  In the words of the statute: "[t]his chapter, being necessary for the welfare of the State and its inhabitants, shall be liberally construed in order to preserve the land, air and water resources of the State."[14]

Section 6003 provides in part that "[n]o person shall, without first having obtained a permit from the Secretary, undertake any activity: . . . [i]n a way which may cause or contribute to the . . . storage . . . of solid wastes."[15]  Section 6002 defines "activity" as, among other things, the "use of any facility, property, or device."[16] Thus, the use of any property or facility in a way that causes or contributes to the storage of solid waste, without a permit, is a violation of Chapter 60.  Section 6018 provides that "[t]he Secretary shall have the power to issue an order to any person violating *any . . . provision of this chapter* to cease and desist *from such violation*."[17]

---

[12] 7 *Del. C.* § 6001(c)(6).
[13] *Id.* § 6005(a).
[14] *Id.* § 6020.  *See also Formosa Plastics Corp. v. Wilson*, 504 A.2d 1083, 1089 (interpreting DNREC's authority under the Act liberally as mandated by the General Assembly and employing a "common sense" interpretation to the Act's provisions).
[15] 7 *Del. C.* § 6003.
[16] *Id.* § 6002.
[17] *Id.* § 6018 (emphasis added).

We agree with our colleagues in dissent that the statutory words "cease and desist" should be given their ordinary meaning. We also agree with our colleagues in dissent that the ordinary meaning of cease and desist is to stop an illegal activity. Where we respectfully disagree is their narrow view of what it means to stop an illegal activity. We believe the statute should be interpreted consistent with the General Assembly's charge to construe liberally the Secretary's authority under the Act. McGinnis is "actively" engaged in the illegal storage of solid waste on its site without a permit. The continuing storage of waste on its property without a permit is a violation of the Act. The Secretary has the authority under Section 6018 to halt *violations* of the Act, not just discrete actions. The only way to stop the ongoing violation is to remove the offending waste pile.[18] We see no meaningful distinction between an order that requires McGinnis to remove an illegal waste pile, as the Secretary did here, and an order that prohibits McGinnis from continuing to store waste on its site without a permit.

Our colleagues in dissent argue that Section 6018 does not expressly permit the Secretary to order a violator to take affirmative action to remedy violations of the Act. As they explain, the Secretary does not have affirmative injunctive relief

---

[18] As the dissent observes, Black's Law Dictionary defines a "cease and desist" order as one "prohibiting a person from continuing a particular course of conduct." *Cease and Desist*, Black's Law Dictionary (11th ed. 2019). When a particular course of conduct will continue unless there is affirmative action, the only way to stop the continuing violation is to act affirmatively.

8

powers like those available in the Court of Chancery. And, according to the dissent, other statutory provisions of the Act address affirmative action to remedy violations. Thus, the argument goes, the General Assembly must have intended that those statutory provisions be used to require affirmative action to correct violations. We respectfully disagree.

First, we understand the dissent's concern with finding an equivalence between the Court of Chancery's injunctive relief powers and those of the Secretary under his cease and desist authority. DNREC argued for this equivalence below and on appeal. They are not the same. The Secretary has the authority to enter a cease and desist order. But unlike the Court of Chancery, which has broad discretion to enforce its orders,[19] the Secretary's remedies for a violation of his order are limited to those set forth in the Act.

The Secretary's civil and administrative enforcement powers are set forth in Section 6005. The section provides that violations of "any order of the Secretary," which would include a cease and desist order, are "punishable" in different ways depending on the nature of the violation.[20] For "completed" violations when the harm is not likely to reoccur, the Secretary can impose a civil penalty enforceable in

---

[19] Ct. Ch. R. 70(b); *see Gallagher v. Long*, 940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007) (TABLE) ("A trial judge has broad discretion to impose sanctions for failure to abide by its orders.").
[20] 7 *Del. C.* § 6005.

9

the Superior Court.[21]  If there is a "substantial likelihood that [the completed violation] will reoccur," the Secretary "may also seek a permanent or preliminary injunction or temporary restraining order in the Court of Chancery."[22]  For continuing violations, the Secretary can seek monetary penalties, and, if the "violation is continuing or threatening to begin," the Secretary "may also seek a temporary restraining order or permanent injunction in the Court of Chancery."[23]  Also, for continuing violations, in the Secretary's discretion, the Secretary may pursue "conciliation."[24]  Conciliation is a remedial alternative to penalties and injunctive relief.  It allows for "a reasonable time for [] correction" of the violation, and a public hearing before enforcement action is taken.[25]  Thus, the Secretary's enforcement authority is not co-extensive with that of the Court of Chancery.

Our colleagues in dissent also argue that there is a discontinuity between the Secretary's authority to issue cease and desist orders under Section 6018 and the remedies allowed under Section 6005.  The dissent believes that the availability of injunctive relief in the Court of Chancery and the reference to "corrective action" in Section 6005(b)(2)'s conciliation provision must mean that the Secretary can only achieve corrective action in the Court of Chancery or through conciliation.

---

[21] *Id.* § 6005(b)(1).
[22] *Id.*
[23] *Id.* § 6005(b)(2).
[24] *Id.*
[25] *Id.*

10

Sections 6018 and 6005, however, act in a complementary fashion. Under Section 6018, the Secretary can require a violator to cease and desist from continuing the illegal storage of solid waste. If the violator ignores the Secretary's order, Section 6005 provides the possible remedies for a violation of "any order of the Secretary." The Secretary may impose monetary penalties. The Secretary may seek injunctive relief in the Court of Chancery. And, in his discretion, the Secretary may opt for conciliation. None of the possible remedies is mandatory or inconsistent with the Secretary's authority to enter a cease and desist order.

We note in conclusion that McGinnis has challenged other paragraphs of the Secretary's order. Paragraphs (3) and (4) are integral to ensuring that McGinnis conducts the waste pile removal in an environmentally responsible manner. But paragraphs (5) and (6) deal with recordkeeping issues and, in our judgment, are too attenuated from the purpose of the cease and desist order—to halt environmental violations on the property. Thus, we find paragraphs (5) and (6) outside the Secretary's cease and desist authority.

## III.

Requirements (1)-(4) and (7) of the Secretary's cease and desist order are enforceable. Requirements (5) and (6) are not. We affirm in part, and reverse in part, the Superior Court's judgment.

11

**VALIHURA,** Justice, dissenting; joined by **VAUGHN**, Justice:

The Appellant, the Delaware Department of Natural Resources and Environmental Control ("DNREC"), presents one issue on appeal: Under Title 7 of the Delaware Code, is the Secretary of DNREC authorized to order affirmative, mandatory injunctive relief to account for and properly dispose of illegal waste and site remediation in the context of a cease and desist order issued pursuant to 7 *Del. C.* § 6018? Basic rules of statutory construction make clear that the answer is "no." This is the conclusion that both the Environmental Appeals Board (the "EAB") and Superior Court reached. Because I believe both tribunals reached the correct conclusion, I respectfully dissent.

*A.*

McGinnis was cited for improperly storing solid waste and operating a materials recovery facility without a permit. The August 17, 2015 Notice of Violation cited McGinnis for two statutory violations and one regulatory violation. Specifically, McGinnis was cited for violating 7 *Del. C.* § 6003(a)(4) for operating a materials facility without a Resource Recovery Facility Permit. In addition, McGinnis was cited for violating 7 *Del. C.* § 6025(b)(2) which prohibits disposal of solid waste except in disposal facilities which have a permit. Finally, McGinnis was cited for violating Section 4.1.1.1 of Delaware's Regulations Governing Solid Waste, which also prohibits operating a solid waste facility without a permit.

1

On August 2, 2016, DNREC's Secretary (the "Secretary") issued McGinnis a cease and desist order (the "DNREC Order"), which required the facility to:

(1) stop receiving and dismantling mobile homes and accumulating construction and demolition waste;

(2) remove all waste consisting of discarded mobile homes and construction/demolition waste within thirty days;

(3) comply with all applicable laws and regulations, specifically utilizing only those transportation companies, disposal facilities, and contractors holding valid permits;

(4) provide, within thirty days, written documentation of the proper disposal or recycling of solid waste from the premises, including identification of the waste hauler used to transport the solid waste, and weigh tickets;

(5) provide, within thirty days, as to each mobile home received since 2001, the date received, the vehicle identification number, date of manufacture;

(6) provide, within thirty days, a detailed explanation of the handling, inspection, storage, disposal, and recycling procedures for all materials obtained from the mobile homes; and

(7) submit, within thirty days, a completed application for a resource recovery permit, prior to accepting any additional mobile homes or construction/demolition waste.[1]

Following the Secretary's issuance of the DNREC Order, McGinnis appealed to the EAB. The EAB held a hearing on May 23, 2017. Both parties stipulated to the facts and agreed that the sole issue for determination by the EAB was whether

---

[1] Opening Br. at 5; *see* App. to Opening Br. at A28 (DNREC Order).

DNREC had the legal authority to compel McGinnis to undertake the affirmative remedies demanded by the order.

The EAB found in its order (the "EAB Order"), by a vote of 5 to 1, that DNREC had adequate legal authority to order paragraphs 1 and 7 of the DNREC Order, but that the Secretary "did not have adequate legal authority to impose paragraphs 2 through 6 of the Order."[2] It concluded that a cease and desist order was not the proper enforcement mechanism for affirmative injunctive relief, and it stated that, "[t]he Board is of the opinion that there may exist other, more appropriate, enforcement mechanisms available to the Secretary to obtain the relief sought."[3] As to DNREC's arguments that the broad authority of the DNREC Secretary to regulate permits was recognized by this Court in *Formosa Plastics Corp. v. Wilson*,[4] and that *Formosa* impliedly authorized the corrective aspects of the DNREC Order, the EAB disagreed and, instead, concluded that, "*Formosa* is a permit revocation and conditions case and provides no authority for the conditions found in paragraphs 2 through 6 in this case."[5]

DNREC then appealed to the Superior Court. The Superior Court analyzed whether the General Assembly had authorized the Secretary "to issue mandatory

---

[2] *McGinnis Auto & Mobile Home Salvage, LLC v. Del. Dep't of Nat. Res. and Envtl. Control*, EAB Appeal No. 2016-08, at 5 (Aug. 8, 2017) [hereinafter *EAB Order*]; App. to Opening Br. at A47.
[3] *Id.*
[4] 504 A.2d 1083, 1088 (Del. 1986).
[5] *EAB Order*, EAB Appeal No. 2016-08, at 5; App. to Opening Br. at A47.

3

injunctions based upon its statutory authority to issue cease and desist orders."[6] The Superior Court found that the plain language of the statute, as well as Title 7 as a whole, supported the conclusion that the enabling statute authorizing DNREC's Secretary to issue cease and desist orders does not authorize it to mandate that a party pursue corrective action.

The Superior Court began by analyzing the statute's plain language to ascertain its meaning, since no definition of a cease and desist order exists in the statute. Applying dictionary definitions of "cease" and "desist," the Superior Court held that, "the common ordinary usage of the language used by the General Assembly in Section 6018 does not support DNREC's argument that Section 6018 authorizes DNREC to compel affirmative corrective action."[7]

Second, the Superior Court applied the principle that each part of a statute should be construed in connection with every other part or section to produce a harmonious whole. It observed that Section 6018 limits the Secretary's cease and desist power to thirty days. Additionally, within Chapter 60, Section 6005(b)(2) authorizes the Secretary to seek an injunction or temporary restraining order from the Court of Chancery. "Accordingly, within the same Chapter but apart from Section 6018, the General Assembly authorized DNREC to seek *court* injunctions

---

[6] *Del. Dep't of Nat. Res. and Envtl. Control v. McGinnis Auto & Mobile Home Salvage LLC*, 2019 WL 851935, at *1 (Del. Super. Feb. 21, 2019) [hereinafter *Opinion*].
[7] *Id.* at *5.

to address violators."[8]  Further, it reasoned that Section 6005(b)(2) is also the only section in Chapter 60 where the Secretary has express authority to order affirmative corrective action.  That portion of Section 6005(b)(2) provides that after the Secretary initiates the conciliation process, and if no hearing is requested, "the Secretary *may order that the correction* be fully implemented by the proposed date."[9]  Accordingly, the Superior Court reasoned that "[t]he General Assembly's decision to include the phrase 'corrective action' in Section 6005(b)(2) but to omit it from Section 6018 is presumed to be intentional."[10]

Looking outside of Chapter 60, the Superior Court further explained that other provisions within other chapters in Title 7 "authorize the Secretary to order affirmative corrective action in limited areas."[11]  It observed, for example, that in Chapter 63 of Title 7 (which is not implicated here), the Secretary is expressly permitted to "order corrective action if he or she finds an imminent hazard caused by releases of hazardous waste."[12]  More specifically, when "hazardous waste may present an imminent and substantial hazard to the health of persons or to the environment," the Secretary "may take such action as he or she determines to be necessary to protect the health of such persons or the environment."[13]  Subsections

---

[8] *Id.*
[9] 7 *Del. C.* § 6005(b)(2) (emphasis added).
[10] *Opinion*, 2019 WL 851935, at *5.
[11] *Id.* (citing 7 *Del. C.* § 7411(a)).
[12] *Id.*
[13] 7 *Del. C.* § 6308.

5

1 and 2 of Section 6308 specify that such action may include steps necessary to "prevent the act or *eliminate the practice*"[14] or "steps as are necessary to prevent or *eliminate the hazard*."[15] Based on this examination of the broader statutory scheme, the Superior Court reasoned that, "[t]he General Assembly's choice to include language permitting the Secretary to order affirmative corrective action elsewhere in Title 7 but to not include it in Section 6018 further demonstrates the limits of Section 6018."[16]

The Superior Court then addressed DNREC's argument that our decision in *Formosa* implies that Section 6018 should be interpreted broadly enough to include an implied authority to order mandatory injunctive relief. Rejecting that argument, the Superior Court concluded that, "*Formosa* does not provide for so broad a premise as DNREC advocates."[17] Instead, it found that "[t]here are no other provisions in Title 7 that reference Section 6018 and expand upon it as do the multiple permit-related provisions identified in the *Formosa* decision."[18] Accordingly, the Superior Court affirmed the decision of the EAB and remanded the matter to the EAB "to take action consistent with its discretion and in accordance with its orderly processes."[19]

---

[14] 7 *Del. C.* § 6308(1) (emphasis added).
[15] 7 *Del. C.* § 6308(2) (emphasis added).
[16] *Opinion*, 2019 WL 851935, at *5.
[17] *Id.* at *6.
[18] *Id.*
[19] *Id.*

*B.*

DNREC then appealed to this Court.  DNREC, remarkably, argues that its cease and desist authority is "concurrent in scope with a preliminary injunction."[20] DNREC repeats its argument that *Formosa* creates a "broad implied authority" for the Secretary, under which he may base his powers to order affirmative, corrective action.  Finally, DNREC argues that the language of Section 6018, when viewed in the context of Chapter 60 as a whole, permits the Secretary to issue corrective action pursuant to his cease and desist powers.  It argues that Section 6018 limits only the duration of a cease and desist order, not the scope, thus indicating the broad power of this administrative enforcement tool.  It contends that the General Assembly intended to allow the Secretary to seek a permanent injunction in the Court of Chancery if compliance has not been reached within thirty days of issuance of the order.

McGinnis counters that DNREC's reading of Section 6018 distorts the plain meaning of the statute and the words "cease" and "desist," which words mean to stop ongoing violations.  McGinnis argues that the words "cease" and "desist" are self-limiting, and the legislature did not need to put any other limits on the

---

[20] Opening Br. at 20.  The Superior Court also observed that, "DNREC likens its Secretary's authority to that of the Court of Chancery."  *Opinion*, 2019 WL 851935, at *3.  McGinnis aptly points out the "structural incongruity" in permitting a Secretary's order of injunctive relief to be appealed to the Superior Court—which has no jurisdiction over orders issuing injunctive relief.

Secretary's power under Section 6018. It claims that the General Assembly intended to limit the Secretary's power under 6018, because in other sections, such as Section 6005(b)(2), the Secretary was authorized to seek permanent, affirmative injunctive relief in the Court of Chancery.

McGinnis also contends that *Formosa* cannot be read to imply the power the Secretary seeks here. It argues that the Secretary would not be restrained by any procedural safeguards if the Secretary were able to issue injunctive-like "cease and desist" orders without any of the long-standing procedural protections that apply to requests for injunctive relief. Further, McGinnis argues that the Secretary would not need to seek injunctive relief in the Court of Chancery if the Secretary already had that power.

Finally, McGinnis argues that paragraphs 5 and 6 of the Secretary's Order require McGinnis to take action in the future, and not to correct some past violation. McGinnis asserts that these paragraphs, even more so than paragraphs 2 through 4, are completely outside the scope of a cease and desist order and outside of the Secretary's authority.

*C.*

I agree with both the EAB and the Superior Court that the Secretary was not authorized under Section 6018 to order the relief in paragraphs 2–6 of the DNREC Order. The Majority contends that the Secretary's power to address a static violation

8

(*e.g.*, storage, as opposed to receiving and dismantling mobile homes) must include an implied power to order mandatory injunctive relief.

That analysis is problematic. First, it ignores the plain meaning of "cease and desist" as those words are commonly understood and used in Section 6018. Second, paragraphs 2–6 order mandatory injunctive relief, which only the Court of Chancery has the power to order. Third, other provisions of the relevant statutory scheme (but, notably, not Section 6018) expressly authorize the Secretary to seek injunctive relief, which suggests that the Secretary does not inherently have that power. For these reasons, explained further below, I would affirm.

### A. The Plain Language of Section 6018 Compels Affirmance

"The starting point for the interpretation of a statute begins with the statute's language."[21] "It is axiomatic that a statute or an ordinance is to be interpreted according to its plain and ordinary meaning."[22] Thus, "[w]here the language of the statute is unambiguous, no interpretation is required and the plain meaning of the

---

[21] *State v. Barnes*, 116 A.3d 883, 888 (Del. 2015); *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 950 (Del. Ch. 2013) ("The most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it."); *Food Mktg. Inst. v. Argus Leader Media*, ___ U.S. ____, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."). Also, "[i]t is well established that administrative agencies . . . derive their powers and authority *solely* from the statute creating such agencies and which define their powers and authority." *Office of the Comm'r, Del. Alcoholic Beverage Control v. Appeals Comm'n, Del. Alcoholic Beverage Control,* 116 A.3d 1221, 1226 (Del. 2015) (citation omitted).
[22] *New Cingular Wireless PCS v. Sussex Cty. Bd. Of Adjustment*, 65 A.3d 607, 611 (Del. 2013).

words controls."[23]  Accordingly, we begin with the plain language of Section 6018, which provides:

> The Secretary shall have the power to issue an order to any person violating any rule, regulation or order or permit condition or provision of this chapter to cease and desist from such violation; provided, that any cease and desist order issued pursuant to this section shall expire (1) after 30 days of its issuance, or (2) upon withdrawal of said order by the Secretary, or (3) when the order is suspended by an injunction, whichever occurs first.[24]

A "cease and desist order" is not defined in Section 6018, nor is it defined elsewhere in Title 7.  "Delaware case law is well settled that undefined words are given their plain meaning based upon the definition provided by a dictionary."[25]  There is nothing in the language of the statute that qualifies the terms "cease" and "desist" or otherwise leads us to believe that these words are being used outside of their ordinary understanding and usage.  Nor are there any other words in the statute, when read in tandem with "cease and desist," that could ostensibly change the

---

[23] *Del. Comp. Rating Bureau, Inc. v. Ins. Comm'r*, 2009 WL 2366009, at *4 (Del. Ch. 2009) (quoting *Ingram v. Thorpe*, 747 A.2d 545, 547 (Del. 2000)) (internal quotation marks omitted); *see In re Adoption of Swanson*, 623 A.2d 1095, 1096–97 (Del. 1993) ("If the statute as a whole is unambiguous and there is no reasonable doubt as to the meaning of the words used, the court's role is limited to an application of the literal meaning of those words.  However, where . . . the Court is faced with a novel question of statutory construction, it must seek to ascertain and give effect to the intention of the General Assembly as expressed by the statute itself.").
[24] 7 *Del. C.* § 6018.
[25] *State v. Taye*, 54 A.3d 1116, 1121 (Del. Super. 2009) (citing *Cephas v. State*, 911 A.2d 799, 800–01 (Del. 2006)).

meaning of those words. Thus, we must look to the common English language to define what exactly a cease and desist order is.[26]

The American Heritage Dictionary defines "cease" as "to put an end to" and to "discontinue."[27] Meriam-Webster defines "cease" as "to cause to come to an end especially gradually; no longer continue" or "to come to an end; to bring an activity or action to an end."[28] Similarly, Merriam-Webster defines "desist" as "to cease to proceed or act."[29] The Oxford English Dictionary defines "cease" as: "a. Of persons and other agents: To stop, give over, discontinue, desist . . . ."[30] It defines "desist" as "[t]o cease (from some action or procedure); to stop, leave off, give over, forbear."[31]

Black's Law Dictionary defines a "cease and desist" order as "[a] court's or agency's order prohibiting a person from continuing a particular course of

---

[26] "[W]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language." *Del. Bay Surgical Servs., P.A. v. Swier*, 900 A.2d 646, 652 (Del. 2006) (quoting 1 *Del. C.* § 303). Further, Section 303 of Title 1 (titled "Words and Phrases") provides:

> Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

[27] *Cease*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2020).
[28] *Cease*, MERRIAM-WEBSTER DICTIONARY (2019).
[29] *Desist*, MERRIAM-WEBSTER DICTIONARY (2019).
[30] *Cease*, THE OXFORD ENGLISH DICTIONARY (2d ed. 1989).
[31] *Desist*, THE OXFORD ENGLISH DICTIONARY (2d ed. 1989).

11

conduct."[32]  Black's Law Dictionary defines "cease" as:  "to stop, forfeit, suspend, or bring to an end."[33]  It defines "desist" as:  "to stop or leave off."[34]

The words "cease" and "desist," in their ordinary usage, share a common theme—they mean to bring actions to an end.  Both are focused on causing something that is currently occurring or ongoing, to stop.  There is nothing in the plain meaning of these words that suggests that they cause conduct to be affirmatively altered or corrected in any way.  This is even more apparent when one contrasts Black's Law Dictionary's definition of "mandatory injunction," which it defines as, "[a]n injunction that orders an affirmative act or mandates a specified course of conduct.—Also termed *affirmative injunction.*"[35]  To say that the words "cease" and "desist" in Section 6018 somehow authorize the Secretary to order mandatory, corrective action seriously disturbs the plain meaning of those words.[36]  But here, DNREC ordered McGinnis to remove, within thirty days, all solid waste and to use authorized transportation companies and disposal facilities, and then to provide various documentation and explanations of inspection of handling, storage,

---

[32] *Cease and Desist*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[33] *Cease*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[34] *Desist*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[35] *Mandatory Injunction*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[36] *See Friends of H. Fletcher Brown Mansion v. City of Wilmington*, 34 A.3d 1055, 1059 (Del. 2011) ("[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (internal quotation marks omitted)).

disposal, and recycling procedures used for all materials removed. That far exceeds any common sense understanding of "cease and desist."

The Majority chides us for taking a "narrow view" of "cease and desist." However, our view is fully consistent with the ordinary, everyday meaning of those words as confirmed by the dictionary definitions. The Majority contorts the words "cease and desist" to mean the exact opposite of what most people would think they mean, namely, to stop. Instead, their definition of "cease and desist" is the same as the Black's Law Dictionary definition of "mandatory injunction"—"an injunction that orders an affirmative act or mandates a specific course of conduct."

Moreover, the Secretary's charge to enforce Chapter 60 of Title 7,[37] and the general policy that Chapter 60 "shall be liberally construed in order to preserve the land, air and water resources of the State,"[38] is not enough to override the plain words of Section 6018. This is particularly so when other provisions of Title 7 expressly authorize the Secretary to seek injunctive relief from the Court of Chancery, or to order corrective action in certain situations.

There is another problem with paragraphs 2–6: They clearly call for mandatory injunctive relief, and as this Court has recognized, only the Delaware

---

[37] *See* 7 *Del. C.* § 6005(a) ("The Secretary shall enforce this chapter.").
[38] 7 *Del. C.* § 6020. This is "necessary for the welfare of the State and its inhabitants." *Id.*

Court of Chancery has jurisdiction to order injunctive relief.[39] It is problematic to conclude that the Secretary has this power, because doing so strips litigants of important procedural protections that are available in the injunction context. For example, before the Court of Chancery can issue a mandatory injunction, "the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts."[40] The applicant must also obtain a bond. The bond requirement exists for any preliminary injunction or restraining order, and further "affords protection from an improvidently granted mandatory injunction."[41]

Further, the durational limit of a cease and desist order (thirty days, unless sooner withdrawn by the Secretary or overcome by an injunction), suggests that it is meant to stop ongoing activity. DNREC and the Majority contend that these

---

[39] *Nat'l Indus. Grp. (Hldg.) v. Carlyle Inv. Mgmt.*, 67 A.3d 373, 382 (Del. 2013) ("[T]he Court of Chancery has *exclusive* jurisdiction where injunctive relief is sought."); *see id.* ("[T]he Court of Chancery is the Delaware court that is constitutionally and statutorily empowered to grant injunctions and to order specific performance."). *See also* 10 *Del. C.* § 341 ("The Court of Chancery shall have jurisdiction to hear and determine all matters and causes in equity."); *FMC Corp. v. New Castle Cnty. Special Servs. Dep't.*, 2018 WL 1110851, at *5 (Del. Super. Feb. 27, 2018) ("[I]f the [New Castle County] General Manager had authority to order injunctive relief, Subsection C of the Penalties Section [of the County Code, permitting him or her to bring a civil action in court] would be superfluous."). Notably, in *FMC*, the Superior Court found that the General Manager "exceeded his authority under the County Code by ordering unilaterally Petitioner to submit and implement a preventive plan at Petitioner's cost," and that, "[s]uch an order is injunctive relief in violation of the County Code and the Court of Chancery's jurisdiction." *Id.*

[40] *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1071 (Del. 2014) (holding that, "[t]o issue a mandatory injunction requiring a party to take affirmative action . . . the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts").

[41] *AM Gen. Hldgs. LLC v. Renco Grp., Inc.*, 2012 WL 6681994, at *7 (Del. Ch. Dec. 21, 2012); Ct. Ch. R. 65(c).

provisions work harmoniously, in that the Secretary may issue corrective action with a thirty-day lifespan and then, if the conduct is still not corrected, the Secretary may seek a permanent injunction in the Court of Chancery. But the plain language of the statute indicates that the General Assembly intended for the Secretary to seek injunctive relief if anything more than a cease and desist order is necessary to remedy a violation of Chapter 60. Indeed, curing McGinnis's "ongoing violation" of "continuing storage," as described by the Majority, fits precisely within what the General Assembly identified as a matter for the Court of Chancery.[42] Also, viewing a cease and desist authority as an administrative alternative to seeking mandatory injunctive relief in the Court of Chancery is inconsistent with the historic exclusive jurisdiction of the Court of Chancery.

The Majority agrees with us that there is no "equivalence" in power between the Secretary and the Court of Chancery.[43] Yet, it still agrees that the Secretary, using a cease and desist order, can order broad mandatory injunctive relief without any of the procedural protections that other applicants for such relief are required to satisfy in Chancery proceedings. That there are other enforcement tools available to

---

[42] *See* 6 *Del. C.* § 6005(b)(2) ("If the *violation is continuing or is threatening to begin*," in addition to a monetary penalty under Section 6005(b)(1), "the Secretary may also seek a temporary restraining order or permanent injunction in the Court of Chancery." (emphasis added)).

[43] In its Opening Brief on appeal, for example, DNREC argues that, "[a]s an interim measure, the cease and desist authority works only if concurrent in scope with a preliminary injunction." It also states that, "[c]ourts have broad authority to issue preliminary injunctions broad enough in scope to prevent further or future environmental harm." Opening Br. at 20. Thus, in the environmental setting, DNREC seeks authority equivalent to that of the Court of Chancery.

the Secretary does not address this reality. And although the Secretary is limited to dealing only with certain environmental subjects (and obviously cannot entertain addressing issues of corporate law, for example), the Majority fails to draw any lines on the scope of that power in ordering citizens to take affirmative action in the environmental arena—again, all without any of the procedural protections that normally would apply in such applications for mandatory injunctive relief.

The Majority's reasoning also collides with the principle that the statutory scheme should be read harmoniously. Each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole.[44] "Statutory construction . . . is a holistic endeavor."[45] The meaning of one provision's text "is often clarified by the remainder of the statutory scheme," and "[w]hen a statute is silent on a particular matter, the otherwise detailed nature of the statute in other respects can be significant."[46] Also, it is presumed that "the General Assembly purposefully chose particular language and [we] therefore construe

---

[44] *Grimes v. Alteon Inc.*, 804 A.2d 256, 265 n.35 (Del. 2002) (*en banc*) (citing 2A Norman J. Singer, *Sutherland on Statutory Construction* § 46:05 (2000)).

[45] *Terex Corp. v. S. Track & Pump, Inc.*, 117 A.3d 537, 543 (Del. 2015) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear . . . or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . . .") (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988)) (internal quotation marks omitted); see *Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989) (stating that statutes "must be viewed as a whole").

[46] *Terex*, 117 A.3d at 543, 544.

16

statutes to avoid surplusage if reasonably possible."[47]  In this regard, the Majority's reasoning does not take account of other parts of Title 7 where the Secretary is expressly authorized to order mandatory corrective action.

For example, McGinnis correctly argues that "[i]f the Secretary already had equity powers as broad as the Court of Chancery, [Section] 6005(b)(2) would not need to authorize him to seek injunctive relief on the very same basis . . . as he may issue a cease and desist order."[48]  As the Superior Court persuasively reasons, reading these two provisions together suggests that if the Secretary already had the power to issue affirmative action through a cease and desist order (as DNREC contends), the Secretary would not need to seek such relief from the Court of Chancery.  Section 6005(b)(2) is the only provision in Chapter 60 that empowers the Secretary to order corrective action, and that is after the Secretary initiates a corrective process.  The Secretary then "may order that the correction be fully implemented by the proposed date."[49]  The General Assembly's decision to include

[47] *Sussex Cty. Dep't of Elections v. Sussex Cty. Republican Comm.*, 58 A.3d 418, 422 (Del. 2013) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011)); *see Clark v. State*, 65 A.3d 571, 578 (Del. 2013); *Zhurbin v. State*, 104 A.3d 108, 110 (Del. 2014); *Chase Alexa, LLC v. Kent Cty. Levy Ct.*, 991 A.2d 1148, 1152 (Del. 2010) ("[W]ords in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning, and courts must ascribe a purpose to the use of statutory language, if reasonably possible." (quoting *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994)) (internal quotation marks omitted)).
[48] Answering Br. at 11.  Section 6005(b)(2) provides:  "If the violation is continuing or is threatening to begin, the Secretary may also seek a temporary restraining order or permanent injunction in the Court of Chancery."  7 *Del. C.* § 6005(b)(2).
[49] 7 *Del. C.* § 6005(b)(2).

the phrase "the Secretary may order [ ] *the correction*" in Section 6005(b)(2) but omit it from Section 6018 must be viewed as intentional.[50] The Court has long respected "the canon of statutory construction that every word chosen by the legislature (and often bargained for by interested constituent groups) must have meaning."[51]

Elsewhere, in other Title 7 provisions, other examples of "corrective action" language can be seen. For example, in the context of hazardous waste disposal, Section 6308 (not invoked here) permits the Secretary when "hazardous waste may present an imminent and substantial hazard to the health of persons or to the environment [to issue an order directing a polluter] to take such steps as are necessary to prevent or *eliminate the hazard*,"[52] and the Secretary has express authority to order violators to "*take corrective action within the time specified in the*

---

[50] "The legislative body is presumed to have inserted every provision for some useful purpose and construction, and when different terms are used in various parts of a statute it is reasonable to assume that a distinction between the terms was intended." *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) (citation omitted). The maxim, "*expressio unius est exclusio alterius*" is also relevant here. *See Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) (stating that, "[i]t is well established that a court may not engraft upon a statute language which has clearly been excluded therefrom," and that, "when provisions are expressly included in one statute but omitted from another, we must conclude that the General Assembly intended to make those omissions.").

[51] *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*, 36 A.3d 336, 344 (Del. 2012) ("[T]he General Assembly 'is presumed to have inserted every provision into a legislative enactment for some useful purpose and construction.'") (quoting *Colonial Ins. Co. of Wis. v. Ayers*, 772 A.2d 177, 181 (Del. 2001)); *see Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 158 (Del. Ch. 2013) ("There is a presumption that the General Assembly carefully chose particular language when writing a statute, and this court will not construe the statute to render that language mere surplusage if another interpretation is reasonably possible.").

[52] 7 *Del. C.* § 6308(2) (emphasis added).

18

*order.*"[53]   These provisions are strong indicators, especially in the context of environmental regulation by DNREC, that the General Assembly intended to limit the power of the Secretary under Section 6018 to only having prohibitory cease and desist authority.   The Court must "give the statutory words their commonly understood meanings."[54]   Courts favor interpretations that "accord[] more coherence" to statutory text,[55] and "read and examine the text of the act and draw inferences concerning the meaning from its composition and structure."[56]  Thus, I believe the Superior Court's statutory analysis is correct.

The DNREC Order itself recognizes the distinction between past and ongoing violations.  In the DNREC Order, DNREC reserved the right to take additional enforcement actions regarding these violations, "including but not limited to one or more of the following:  an action under 7 *Del. C.* § 6005(b)(1) seeking penalties for *past* violations, an action under 7 *Del. C.* § 6005(b)(2) seeking penalties for *continuing violations, an action in the Court of Chancery* pursuant to 7 *Del. C.* § 6005(b)(2) *seeking a temporary restraining order or an injunction*, and the imposition of civil penalties and recovery of the Department's costs and attorney's

---

[53] 7 *Del. C.* § 6309 (a)(2) (emphasis added); *see* 7 *Del. C.* § 7411 (authorizing the Department, with a thirty-day notice, to order compliance with any requirement of Chapter 74 (which addresses underground storage tanks) to include affirmative correction action).

[54] *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982).

[55] *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

[56] *Klotz v. Warner Commc'ns, Inc.*, 674 A.2d 878, 879 (Del. 1995) (quoting 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.01 (5th ed. 1992)).

fees pursuant to 7 *Del. C.* § 6005(b)(3) & (c)(1)."[57] In its Opening Brief on appeal, DNREC states that, "the Cease and Desist Order here was a minimal sanction against McGinnis, as compared to administrative and civil penalties and cost recovery, a preliminary injunction, or criminal charges."[58] DNREC could have sought a more appropriate remedy (as the EAB recognized) to address the continuing nature of the violations. Instead, it has spent years trying to fit the square peg of mandatory injunctive relief into the round hole of a cease and desist order. In the interim, the pile of debris is still there.[59]

Perhaps these obvious statutory construction problems explain DNREC's heavy reliance on *Formosa*. In *Formosa*, we held that the Secretary's ability to revoke a permit was impliedly authorized by the Secretary's sole authority to issue permits.[60] This Court in *Formosa* stated that the Secretary's powers under this chapter are "broad and plenary." However, this finding of "broad and plenary" powers is not enough to override the clear, plain meaning of Section 6018, and the

---

[57] App. to Opening Br. at A29 (DNREC Order) (emphasis added).

[58] Opening Br. at 22–23 n.38.

[59] The Majority also lists the various enforcement powers of the Secretary. Under Section 6005, the Secretary can address a violation by civil penalties for completed violations; monetary penalties for continuing violations; temporary restraining orders or injunctions for continuing violations or for violations that are about to begin; and administrative penalties of not more than $1000 per day for each day of a violation, to name a few. We are not saying the trash pile should remain. Indeed, we do not like trash piles either and wish for it to be removed. But as both the EAB and the Superior Court have said, the Secretary picked the wrong weapon in its arsenal to order removal of the trash heap.

[60] *Formosa*, 504 A.2d at 1091.

20

other indications by the General Assembly elsewhere in Title 7 that such power should not be implied in a cease and desist order.[61]

Finally, although I agree with the Majority that paragraphs 5 and 6 were outside the bounds of a cease and desist order, I disagree with its reasoning. The Majority reasons that paragraphs 5 and 6 "deal with record keeping issues and . . . are too attenuated from the purpose of the cease and desist order—to halt environmental violations on the property." This reasoning invites disputes over whether an order is "too attenuated" from the "purpose of the cease and desist order." I think this will unnecessarily create confusion. Rather, I think they are outside the bounds of the cease and desist order because they, too, order mandatory, affirmative injunctive relief.

For the reasons set forth above, I respectfully dissent.

---

[61] In its Opening Brief on appeal, DNREC states, "DNREC relies on the holding and the sound reasoning of the Court in *Formosa* as controlling and persuasive authority to reverse the EAB decision to the contrary." Opening Br. at 26. DNREC places almost exclusive reliance on this Court's decision in *Formosa* in support of its arguments on appeal. The Majority similarly argues that this Court "must give the statute a liberal construction to achieve its purposes." But perhaps recognizing the limits of our holding in *Formosa*, the Majority relegates *Formosa* to a mere footnote. Instead, the Majority comes up with a counterintuitive statutory construction argument of its own that no one made in this case (namely, that Section 6002 defines "activity" as the "use of a facility," McGinnis's use of the facility is a "violation" under Section 6003, and that the Secretary can order McGinnis to "cease" storing trash by affirmatively removing and remediating the site).

21