FRIENDS OF the H. FLETCHER BROWN MANSION, a Delaware unincorporated association, Kristen F. Diferdinando, Dann J. Gladnick, Mitchell Glass, Michael Gunselman, Jeffrey T. Kusumi and Constance M. Smith, Petitioners Below, Appellants,

v.

The CITY OF WILMINGTON, a municipal corporation of the State of Delaware, City of Wilmington Zoning Board of Adjustment, and Ingleside Homes, Inc., a Delaware non-profit corporation, Respondents Below, Appellees.

No. 753, 2010.

Supreme Court of Delaware.

Submitted: Nov. 23, 2011.
Decided: Dec. 12, 2011.

Richard L. Abbott, Esquire, Abbott Law Firm, Hockessin, Delaware, for appellants.

Martin C. Meltzer, Esquire, Assistant City Solicitor, Wilmington, Delaware, for City of Wilmington's Zoning Board of Adjustment.

John E. Tracey, Esquire, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, for Ingleside Homes, Inc.

Before STEELE, Chief Justice, HOLLAND, BERGER and RIDGELY, Justices, and GLASSCOCK, Vice Chancellor,[1] constituting the Court en Banc.

HOLLAND, Justice:

The petitioners-appellants, Friends of the H. Fletcher Brown Mansion (the "Appellants"), appeal from a Superior Court decision in favor of the respondents-appellees, City of Wilmington (the "City"), City of Wilmington Zoning Board of Adjustment (the "ZBA"), and Ingleside Homes, Inc. ("Ingleside") (collectively, the "Appellees"). The ZBA had granted three use variances (collectively, the "Use Variance") to Ingleside to allow partial demolition and renovation of the H. Fletcher Brown Mansion (the "Brown Mansion") for use as a thirty-five unit multi-family apartment building for senior citizens.

The appellants raise three arguments on appeal. First, the appellants submit that the ZBA was not properly composed. Second, they contend that the Superior Court erred because the Use Variance conflicts with the City's Comprehensive Plan in violation of title 22, section 702(d) of the Delaware Code. Third, they argue that the record lacked substantial evidence to support a finding of unnecessary hardship.

We have concluded that the ZBA was not properly constituted. Therefore, it was without authority to act. Consequently, there is no need to address the merits of the appellants' other two arguments. The judgment of the Superior Court must be reversed. This matter will be remanded for further proceedings in accordance with this opinion.

*Facts*

The Brown Mansion is located at 1010 North Broom Street, in Wilmington, Delaware. The Brown Mansion includes a two-and-a-half story, 10,000 square foot structure built in 1917 with outbuildings and gardens. It is situated in the Cool Spring neighborhood of the City and is part of Cool Spring/Tilton Park City Historic District. The Brown Mansion was used as a nursing home prior to 1971, when it was converted into office space. It served as office space from 1971 to 2008.

The property is zoned R–1. As set forth in section 48–131(a) of the Wilmington City Code (the "Code"):

The R–1 district, one-family detached dwellings, is designed to protect and maintain those residential areas now developed primarily with one-family detached dwellings on relatively large lots and adjoining vacant areas likely to be developed for such purposes. It will enable the city to continue to provide a restricted type of environment which would otherwise be found only in suburban areas.[2]

The Code does not provide for apartment houses in an R–1 district.[3] Section 48–131(b) further provides:

In any R–1 district[,] no building or premises shall be used and no building

1. Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 and 4(a).

2. Wilmington City Code § 48–131(a).

3. *Id.*

shall be erected or altered, except as provided elsewhere in this chapter, which is arranged, intended or designed to be used except for one or more of the uses listed in the following subsections of this section.[4]

Ingleside, a non-profit organization, is the owner of the Brown Mansion. Ingleside's mission is to provide affordable housing to senior citizens. Ingleside owns and operates a 208–unit apartment building behind the Brown Mansion (the "Ingleside Apartments"). The Ingleside Apartments are connected to the Brown Mansion by a hallway that houses a generator and an air handler. The Ingleside Apartments are zoned multifamily residential under City Code section 48–138(a).

■ The parcel on which the Brown Mansion is governed by the Neighborhood Comprehensive Development Plan for the Westside Department of Planning and Development, which was adopted by the City Council in 1979 (the "1979 Comprehensive Plan").[5] In 2003, the City adopted an updated City–Wide Plan of Land Use (the "City–Wide Plan"), which is a Component of the Comprehensive Development Plan. The City–Wide Plan states that "Neighborhood Comprehensive Plans include a more detailed analysis of land use and zoning."[6] The 1979 Comprehensive Plan contains a "Proposed Land Use Plan,"

which in turn designates the parcel on which the Brown Mansion sits as "Low Density Residential."[7] The City–Wide Plan further provides that "Low Density Residential" correlates with an R–1 district. By contrast, "High Density Residential" correlates with R–5A and R–5B zones, which provide for multi-unit apartment houses.[8]

Approximately four years ago, Ingleside and the Cool Spring/Tilton Neighborhood Association (the "Civic Association") began to consider other uses for the Brown Mansion. Ingleside initially sought to rezone the property from a single family (R–1) zone to a multi-family (R–5) zone, but then decided to pursue a different approach. The record indicates that, at this point, the City mayor's office asked Leon Weiner & Associates, a building development company, to become involved in the process to reach a compromise between Ingleside and the community.

Ingleside developed a new proposal (the "Proposal") that would demolish 1,200 square feet of the Brown Mansion, preserve the remaining part of the structure, and build a four-story addition behind the Brown Mansion to combine the Brown Mansion and the Ingleside Apartments. The four-story addition would provide thirty-five units of affordable housing for seniors.

4.  *Id.* § 48–131(b).

5.  On December 17, 2009, one day after the ZBA issued its written decision in this matter, the Wilmington City Council adopted a new Comprehensive Development Plan for the West Side Analysis Area (the "2009 Comprehensive Plan"). The 2009 Comprehensive Plan supersedes the 1979 Comprehensive Plan governing the Westside Neighborhood. This Court reviews a ZBA decision in light of the plan in effect at the time a use variance is approved. *See, e.g., Lynch v. City of Rehoboth Beach,* 894 A.2d 407, 2006 WL 568764, at *1 & n. 2 (Del. Mar. 7, 2006) (finding new comprehensive plan not applicable where plan

took effect after City adopted zoning decision in dispute); *O'Neill v. Town of Middletown,* 2006 WL 205071, at *37 (Del.Ch. Jan. 18, 2006) ("[T]he Court must measure the rezoning against the comprehensive plan in effect at the time of the rezoning, even though obviously outdated but one still carrying the force of law.").

6.  City-wide Plan of Land Use at 25 (2003).

7.  Neighborhood Comprehensive Plan for the West Side Analysis Area at 28 (1979).

8.  Wilmington City Code §§ 48–136–38.

Ingleside submitted an application to the ZBA, requesting three use variances: a variance to permit a multifamily use in an R–1 zone; a side variance to permit a setback of thirteen feet, rather than fifteen feet; and a variance to permit a four-story structure. Ingleside also presented the Proposal to the Design Review & Preservation Commission (the "DRPC"). On October 21, 2009, the DRPC approved the Proposal upon the condition that Ingleside obtain approval for a use variance from the ZBA.

On October 28, 2009, the ZBA held a hearing on Ingleside's use variance application. The ZBA was comprised of three City employees: Harold Lindsey, an employee of the City Department of Real Estate and Housing; David Blankenship, of the Department of Public Works; and Mark Pilnick, a First Assistant City Solicitor.[9] At the conclusion of the hearing, the three members of the ZBA unanimously approved Ingleside's three variance requests.

After the ZBA granted the Use Variance, the appellants filed a Verified Petition in *Certiorari* in the Superior Court. The Superior Court denied the appellants' request for relief. The Superior Court concluded that the ZBA had properly granted the Use Variance, finding that (1) the composition of the ZBA was permissible; (2) the Brown Mansion zoned as a single-family residence imposed an unnecessary hardship on Ingleside; (3) the ZBA's decision was not arbitrary and capricious; (4) the variance was not in conflict with the City's Comprehensive Development Plan; and (5) sufficient proof existed that adequate parking was available come the zoning change to multi-family use.

### ZBA Section 322(a)

At issue in this case is the proper construction of title 22, section 322(a) of the Delaware Code whereby the City formed its ZBA pursuant to this statute. The relevant, and contested, portion of section 322(a) reads as follows:

> In cities or incorporated towns not having heretofore adopted a home rule charter pursuant to Chapter 8 of this title, the board of adjustment shall consist of the chief engineer of the street and sewer department, the city solicitor and the mayor or an authorized agent of the mayor. If the city or incorporated town has no city engineer or city solicitor, then the mayor or chief executive of such city or town shall appoint 2 members. . . . [10]

The Appellants and the City agree that neither the "City Solicitor" nor the "City Engineer"[11] served on the ZBA for purposes of approving the Use Variance. The record reflects that the ZBA was comprised of the Director of Transportation, David Blankenship of the City Department of Public Works in place of the city engineer; First Assistant City Solicitor Mark Pilnick, in place of the city solicitor, and Harold Lindsey of the City Department of Real Estate and Housing, as the mayor's authorized agent.

The Appellants argue that under section 322(a), the ZBA's composition was impermissible because the statutorily mandated City Solicitor and City Engineer members did not participate in the decision. As such, the Appellants contend that the

---

9. *Friends of the H. Fletcher Brown Mansion v. City of Wilmington,* 2010 WL 5551334, at *13 (Del.Super. Aug. 26, 2010).

10. Del.Code Ann. tit. 22, § 322(a) (West 2011).

11. The statute uses both the term "City Engineer" and "Chief Engineer." *Id.*

ZBA's decision must be invalidated. However, the City (supported by co-appellee Ingleside Homes, Inc.) argues that the plain language of section 322(a) does not control.

### Statutory Construction

■■■■ "The goal of statutory construction is to determine and give effect to legislative intent."[12] "[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms."[13] Moreover, "[w]here the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion."[14]

■■■ This Court has held that where the General Assembly delegates zoning authority to local jurisdictions, there must be "strict compliance with the [legislated] procedures."[15] This is because "zoning ordinances are in derogation of common law property rights...."[16] The strict conformance rule must be applied in examining the composition of the ZBA.

### ZBA Improperly Composed

■■■ The plain language of section 322(a) allows for the Mayor to appoint an authorized agent to serve on the ZBA. The absence of similar plain language for the Chief Engineer and the City Solicitor indi-

cates that the General Assembly did not intend for an analogous delegation option to exist for these two members. Accordingly, section 322(a)'s plain language precludes a conclusion that the Chief Engineer and City Solicitor may appoint agents to serve in their place on the ZBA. Because section 322(a)'s language is plain and unambiguous, this Court's sole function is to enforce the statute according to its terms.

The City argues, however, that this Court should not enforce the plain language of section 322(a). The City contends that section 322(a) should be construed in light of the Wilmington City Charter, which provides for the performance of department duties by designees. The City of Wilmington Charter at section 3–101 states:

> Each department shall have as its head an officer who, either personally or by deputy or by a duly authorized agent or employee of the department, and subject at all times to the provisions of this Charter, shall exercise the powers and perform the duties vested in and imposed upon the department.[17]

Listed in this section are both the Office of the City Solicitor and the Public Works Commissioner. Thus, the City argues that section 3–101 permits both department heads (the City Solicitor and the Chief Engineer) to delegate their duties and responsibilities, including service on the ZBA.

---

**12.** *Del. Dept. of Health & Soc. Servs. v. Jain,* 29 A.3d 207, 215 (Del.2011).

**13.** *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (citation omitted).

**14.** *Id.* (citations omitted).

**15.** *Carl M. Freeman Assocs., Inc. v. Green,* 447 A.2d 1179, 1182 (Del.1982) ("Because zoning ordinances are in derogation of common law property rights, [there must be] strict compli-

ance with the [legislated] procedures.") (alteration in original) (citations omitted). This strict conformance rule has been applied to find an oral resolution to be an "impermissible divergence" from the legislated requirement that amendment of a comprehensive plan be in writing. *Fields v. Kent Cnty.,* 2006 WL 345014, at *3 (Del.Ch. Feb. 2, 2006).

**16.** *Carl M. Freeman Assocs., Inc. v. Green,* 447 A.2d at 1182 (citation omitted).

**17.** City of Wilmington Charter § 3–101.

The City's delegation argument fails for two reasons. First, the Charter permits the delegation of duties imposed upon *the department* rather than specific officers of the department. However, section 322(a) does not provide that the ZBA be composed of the Law Department and the Department of Public Works. Rather, it states that it must consist of specific officers—the *Chief Engineer and the City Solicitor*—from each department.

Importing the delegation power of section 3–101 of the City Charter into section 322(a) by a judicial interpretation is not a narrow reading of the zoning statute and is inappropriate in the absence of explicit language from the legislature. Section 322(a)'s enumeration of specific officers for the Board's composition, instead of requiring general departmental participation, precludes a delegation. Service on a quasi-judicial panel, such as the ZBA,[18] is not within the scope of the duties "vested in and imposed upon" the departments that the City Solicitor and the Chief Engineer head.

Second, and alternatively, the City relies upon the principle of statutory construction that a reference to a municipal department or its head is generally assumed, as a term of art, to include employees of the department. The general assumption is inapplicable in this case because section 322(a)'s plain language explicitly provides for different treatment of the Mayor (specifically permitting him to delegate his ZBA responsibilities) in contrast to the Chief Engineer and City Solicitor, both of whom are not afforded an analogous statutory ability to delegate. If the General Assembly had wanted to provide this same delegation authority for the Chief Engineer and the City Solicitor, it could have done so by including comparable delegation language. The absence of similar delegation language in the case of the Chief Engineer and the City Solicitor demonstrates the General Assembly's intent *not* to provide delegation authority for those two members.

■ The maxim *expressio unius est exclusio alterius* is particularly relevant in this case. "As the maxim is applied to statutory interpretation, where a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are affirmatively or negatively designated, there is an inference that all omissions were intended by the legislature."[19] As the United States Supreme Court has noted, for a court to supply alleged statutory omissions by the legislature transcends the judicial function in a constitutional system that provides for a separation of powers.[20]

This Court holds that, pursuant to the plain language of section 322(a), the appointment of an agent of the Chief Engineer and an agent of the City Solicitor to the ZBA was improper. A properly constituted ZBA must consist of the City Solicitor and the City Engineer, and not agents of either office.[21] Therefore, the

---

**18.** *See, e.g., Rehoboth Art League, Inc. v. Bd. of Adjustment of Town of Henlopen Acres*, 2009 WL 3069672, at *2 (Del.Super.Ct. Aug. 20, 2009) ("This [c]ourt has routinely determined that a Board of Adjustment is a quasi-judicial agency.").

**19.** *Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del.2007) (quoting Norman J. Singer, Sutherland Statutes and Statutory Construction, § 4915 (3d ed.)). *See also Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del.1982).

**20.** *W. Va. Univ. Hosp. v. Casey*, 499 U.S. 83, 101, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub.L. No. 102–166.

**21.** *See, e.g., State Farm Mut. Auto. Ins. Co. v. Hallowell*, 426 A.2d 822, 827 (Del.1981), *superceded by statute on other grounds*, 21 Del. C. § 3902 (1982). ("[I]t is not within the power of the Court to amend clear statutory language. The amending responsibility be-

ZBA was not properly constituted at the time the Use Variance was granted. Because the ZBA was not properly constituted, its decision must be set aside.

### Statutory ZBA Alternative

The City argues that giving effect to the plain meaning of section 322(a) will be unreasonably burdensome to the officials directed to serve on the ZBA. The General Assembly has already provided a solution, if service on the ZBA is a burden on the City Solicitor and the City Engineer. Title 22, section 322(b) states that cities with a home rule charter may establish a board of adjustment consisting of five members who are city residents of the city. Section 322(c) mandates section 322(a) as the default provision *only* if a home rule charter city eschews the option of establishing a board of adjustment under section 322(b). Thus, the General Assembly has provided the City of Wilmington with the authority to decide whether to compose a board of adjustment under section 322(b) or remain with the default composition that is provided in section 322(a).

### Conclusion

Our holding in this case is limited to its facts and the ZBA statute. It has no effect on the general rule that the duties imposed on a department head may be carried out by agents within the department. The judgment of the Superior Court is reversed. This matter is remanded for further proceedings in accordance with this opinion.

longs to the General Assembly ....") (citations omitted).