IN THE SUPREME COURT OF THE STATE OF DELAWARE

RANDON WILKERSON, § §
§ No. 47, 2024
Defendant Below, §
Appellant, § Court Below—Superior Court
§ of the State of Delaware
v. §
§ Cr. ID. Nos. 2104013877,
STATE OF DELAWARE, § 2104013901, and 2104013945
§
Appellee. §

Submitted: October 23, 2024
Decided: January 7, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Patrick J. Collins, Esq., Collins Price & Warner, Wilmington, Delaware, *for Appellant Randon Wilkerson.*

Brian L. Arban, Esq., Delaware Department of Justice, Wilmington, Delaware, *for Appellee State of Delaware.*

**GRIFFITHS**, Justice:

While under the influence of illegal drugs, the defendant bludgeoned and killed a police officer and assaulted several others. The defendant claims that his drug-fueled rampage was the product of someone surreptitiously substituting bath salts for his methamphetamine. Based on that substitution, the defendant sought to assert a statutory involuntary intoxication defense, but the Superior Court granted a motion *in limine* preventing the presentation of that defense as a matter of law. The court also concluded that the defendant's proffered evidence in support of the defense was inadmissible.

The defendant raises four issues on appeal, but we need only reach one. That issue is whether a person who knowingly introduces an unlawful intoxicating substance into his or her body is precluded from presenting an involuntary intoxication defense when: (a) the unlawful intoxicating substance differs from the one that the person thought he or she was introducing, or (b) the effects of the unlawful intoxicating substance differ from those that the person anticipated.

Based on the plain text of Title 11, Section 423 of the Delaware Code, codifying the involuntary intoxication defense, we hold that a person who knowingly introduces an unlawful intoxicating substance into his or her body is precluded from presenting an involuntary intoxication defense unless certain statutory exceptions apply.

2

I.

A.

Defendant Randon Wilkerson and his girlfriend, Amanda Rooks, lived in the house of Charles Meagher in Delmar, Delaware.[1] Several other individuals also lived in the Meagher house, many of whom were illegal drug users.[2] As for Wilkerson, he was a "veteran" drug user,[3] spending about $400 per day on illegal drugs.[4]

On April 24 and 25, 2021, Wilkerson celebrated his thirtieth birthday by consuming alcohol and using illegal drugs at the Meagher house. Over these two days, Wilkerson and Meagher drank "about 100" small bottles of Smirnoff vodka.[5] Additionally, Wilkerson's girlfriend injected a substance that she thought was methamphetamine into his arm. After that injection, Wilkerson smoked crack and injected cocaine.[6] Wilkerson also admitted to taking heroin.

---

[1] The parties in this action agreed to a stipulated fact bench trial. Unless otherwise noted, the facts here are drawn from the Trial Stipulation of Facts. *See* App. to Opening Br. at A537–58 (Trial Stipulation of Facts).

[2] App. to Opening Br. at A226 (Apr. 25, 2021 Interview of Amanda Rooks by Detective Csapo).

[3] *See* Delaware Supreme Court, Oral Argument Video, Vimeo, at 12:05–10 (Oct. 23, 2024) https://vimeo.com/1022542358 [hereinafter *Oral Argument*].

[4] *See* App. to Opening Br. at A569 (Dec. 8, 2023 Sentencing Transcript) (Prosecutor: "[Wilkerson] had a $400-a-day drug habit.").

[5] *Id.* at A546 (Statement by Amanda Rooks) ("Throughout the day and night, Wilkerson and Meagher drank about 100 of the small $1 Smirnoff bottles.").

[6] Wilkerson's toxicology report provided that his blood contained methamphetamine, cocaine, and fentanyl. *Id.* at A198–99 (Oct. 7, 2021 Delaware Division of Forensic Science Toxicology Report).

After introducing these substances into his body, Wilkerson began "acting crazy" in the early morning hours of April 25.[7] He started by throwing a dumbbell into one bedroom door and banging repeatedly on other bedroom doors, trying to get others to drink with him. He yelled at his girlfriend, calling her a "whore" and "white trash,"[8] and then, as if flipping a switch, telling her that he loved her in the same breath. Wilkerson also assaulted Meagher, hitting him with a door and punching him in the eye.[9] During this series of events, Wilkerson was heard saying that the methamphetamine was causing him to act this way.

Shortly after 5:00 a.m., Wilkerson's conduct compelled Meagher to call 911. The Delmar Police Department dispatched Corporal Keith Heacook to the Meagher house. At 5:27 a.m., Corporal Heacook reported that he had arrived on the scene. A few minutes later, a dispatcher tried to contact Corporal Heacook but received no response. After receiving no response, the dispatcher sent more officers to the house.

Inside, Corporal Heacook lay beaten on the floor; Wilkerson had attacked him. As the police would learn later from an occupant of the house, after Corporal Heacook arrived, Wilkerson yelled, "[W]ho's calling the f***ing cops, I'll kill

---

[7] *Id.* at A546.

[8] *Id.*

[9] When Monique Windsor, another occupant of the Meagher house, went to assist Meagher, she observed Wilkerson "talking to an imaginary person by the chair in the living room and talking about being a rap star and rapping to the chair." *Id.* at A548.

them."[10]  Hiding in her bedroom, that same occupant heard "a lot of commotion coming from downstairs," including the sound of a dog growling, so she crept downstairs to look.[11]  When she reached the foot of the stairs, she saw a man, Corporal Heacook, lying face-down in the living room.  She then saw Wilkerson enter the room and repeatedly kick Corporal Heacook in the face.  After seeing that attack, she ran back to her bedroom and locked the door.

After attacking Corporal Heacook,[12] Wilkerson left the house and knocked on the backdoor of Steven and Judith Franklin, who lived across the street from the Meagher house.  The Franklins were both in their seventies.  Hearing the knock, Mr. Franklin asked who was at the door.  Wilkerson replied, "I live across the street with Chuck [Meagher] and a rape of a kid is going on over there.  Chuck says you can help."[13]  No rape had occurred.  Wilkerson would state later that the drugs caused him to believe there was "some big sex trafficking ring going on."[14]  After hearing the claim of child rape, Mr. Franklin let Wilkerson enter his home.  Once inside,

---

[10] *Id.*

[11] *Id.*

[12] The record is not clear regarding the timeline of all events.  But based on the statement by Windsor to police, Wilkerson attacked Corporal Heacook and then left the Meagher house.  *Id.* at A548–49.  A short time later, Windsor heard a "woman screaming at the top of her lungs from outside the home."  *Id.* at A549.  It seems likely that this woman was a neighbor, Mrs. Franklin.  Thus, it appears that Wilkerson attacked Corporal Heacook, left the Meagher house, went to the Franklins' home, attacked the Franklins, and then returned to the Meagher house.

[13] *Id.* at A551.

[14] *See id.* at A584 (Dec. 8, 2023 Sentencing Transcript).

Wilkerson immediately asked Mr. Franklin about borrowing assault rifles. Now concerned, Mr. Franklin invited Wilkerson to sit on the couch in his living room.

Instead of sitting, Wilkerson, unprovoked, punched Mr. Franklin in the head. He also punched Mrs. Franklin, who had exited her bedroom after hearing noise in the living room. He then struck the Franklins with glass figurines, saying to Mr. Franklin, "[M]other f***er, I'm going to kill you."[15] To stave off the attack, Mr. Franklin jammed his thumb into Wilkerson's eye and wrapped his hand around Wilkerson's throat. Mr. Franklin would state later that it seemed like Wilkerson felt no pain and was under the influence of drugs. Wilkerson then abruptly stopped assaulting Mr. Franklin,[16] exited the Franklins' home, and walked back across the street to the Meagher house.

After reentering the house, Wilkerson again attacked Corporal Heacook— who was unconscious on the floor—with a dumbbell and Corporal Heacook's collapsible baton.[17] Wilkerson then tried to enter a bedroom where his girlfriend and another person were hiding. The additional officers dispatched due to Corporal Heacook's radio silence arrived at 5:48 a.m. They entered the house and found

---

[15] *Id.* at A551.

[16] Shortly after, the Franklins called 911.

[17] *See* App. to Opening Br. at A575–76 (Dec. 8, 2023 Sentencing Transcript) (Prosecutor: "When the defendant returned [from the Franklins'], Corporal Heacook was still down, incapacitated. The defendant said he threw a dumbbell at his head and tried to take his gun. He said he did take Corporal Heacook's ASP baton and struck him over the head with it.").

6

Corporal Heacook lying face-down in a pool of blood in the first-floor living room. They noticed that the house was in complete disarray, suggesting that a struggle had occurred. One officer pulled Corporal Heacook into the front yard and began performing CPR, but Corporal Heacook did not regain consciousness.[18]

More officers soon arrived. As they drove up to the house, Wilkerson jumped from a second-floor bedroom window into the backyard. Officers located Wilkerson walking around the backyard with blood on his hands, talking to himself. They took him into custody and transported him to Delaware State Police Troop 5.

At Troop 5, officers placed Wilkerson on a bench in the detention area and positioned a digital recorder near him. Wilkerson stated to himself: "I killed him"; "I smashed him over the head with the weight"; "I beat the cop in the head, I smashed his head."[19] When interviewed by police, Wilkerson admitted that he assaulted Mr. Franklin with a glass figurine but denied seeing or interacting with Corporal Heacook. He said that he had not slept in three days and admitted to consuming alcohol, methamphetamine, and heroin. After the interview, when a phlebotomist tried to draw Wilkerson's blood after police obtained a search warrant, Wilkerson kicked the phlebotomist. Wilkerson's toxicology results show that he had

---

[18] Corporal Heacook was eventually transported to a hospital by ambulance.

[19] App. to Opening Br. at A543.

methamphetamine, cocaine, and fentanyl in his blood.[20] The toxicology screen did not detect cathinones (commonly known as bath salts) in Wilkerson's blood.

Back at the house, investigators located a large pool of blood where Corporal Heacook had been lying. Near the pool of blood, they spotted Corporal Heacook's collapsible baton in its extended position with part of its end missing. They found his flashlight and a twenty-pound dumbbell within a few feet of the pool of blood.[21] They also found blood on the walls, floor, and a cardboard box near where Corporal Heacook's body was discovered.

Wilkerson's actions on April 25 caused serious injury or death to three individuals. Mr. Franklin was transported to a hospital and received several staples to close a laceration in his head and was diagnosed with a skull fracture. Mrs. Franklin was also treated at a hospital for an orbital fracture, a nasal fracture, and several facial lacerations. Corporal Heacook, after being transported to the

---

[20] *Id.* at A198–99 (Oct. 7, 2021 Delaware Division of Forensic Science Toxicology Report).

[21] It appears that Wilkerson threw the dumbbell at Corporal Heacook and struck him with his baton, all of which occurred after Corporal Heacook was already unconscious. *See id.* at A575–76 (Dec. 8, 2023 Sentencing Transcript) (Prosecutor: "As for Corporal Heacook, the defendant told the [presentence investigator] when Corporal Heacook entered his house, the defendant hit him and knocked him out. . . . The defendant proceeded to stomp on his head. The defendant went over to the Franklins and viciously assaulted both of them. When the defendant returned, Corporal Heacook was still down, incapacitated. The defendant said he threw a dumbbell at his head and tried to take his gun. He said he did take Corporal Heacook's ASP baton and struck him over the head with it.").

University of Maryland Shock Trauma Center, died three days later from head injuries.

B.

On June 14, 2021, Wilkerson was indicted on fifteen counts:  murder first degree (two counts), assault first degree (two counts), burglary first degree (one count), possession of a deadly weapon during the commission of a felony (five counts), possession of a deadly weapon by a person prohibited (three counts), terroristic threatening (one count), and assault third degree (one count).[22]

As discovery progressed, Wilkerson's counsel sought to develop an involuntary intoxication defense.  He hired a private investigator, who interviewed Wilkerson's girlfriend, Rooks.[23]  The interview notes reflect that, after April 25, Rooks spoke to an unidentified friend, who told her that Wilkerson's behavior on April 24 and 25 was consistent with a person under the influence of bath salts.[24] After this conversation, Rooks and Monique Windsor, who was also present in the Meagher house on April 24 and 25, traveled to a drug dealer's house—the same dealer who sold Rooks and Windsor the purported methamphetamine that Rooks

---

[22] *See id.* at A112–17 (Grand Jury Indictment).  Later, the State added a count for offensive touching, spurring from Wilkerson kicking the phlebotomist.  *See id.* at A560 (Oct. 16, 2023 Verdict Form).

[23] *Id.* at A214–19 (July 19, 2022 Interview Notes by Private Investigator of Amanda Rooks).

[24] *Id.* at A218 (July 19, 2022 Interview Notes by Private Investigator of Amanda Rooks).

9

injected into Wilkerson's arm.[25]  They bought drugs and took them back to Rooks' unidentified friend.[26]  That friend visually inspected the drugs and stated that they were bath salts, not methamphetamine.[27]  Rooks became convinced that she injected bath salts into Wilkerson instead of methamphetamine.[28]

In September 2022, Wilkerson's counsel contacted NMS Labs to conduct additional testing on Wilkerson's blood sample.[29]  NMS Labs tests for more bath salts analogues than the Delaware Division of Forensic Science lab.[30]  But the vial containing Wilkerson's blood sample broke during transport to NMS Labs, resulting in no testable sample.[31]

Wilkerson's counsel next retained two individuals to offer expert opinions on bath salts.  Andrew Ewens, Ph.D., a board-certified toxicologist,[32] compared drug testing panels for the Delaware Division of Forensic Science and NMS Labs.[33]  He

---

[25] *Id.* at A219 (July 19, 2022 Interview Notes by Private Investigator of Amanda Rooks).

[26] *Id.*

[27] *Id.*

[28] Additionally, in November 2022, while speaking to police regarding trial preparations, Rooks told a detective that she thought that she injected Wilkerson with bath salts instead of methamphetamine, based on her "own personal opinion."  *Id.* at A354, A359 (Nov. 30, 2022 Interview of Amanda Rooks by Detective Csapo).

[29] *Id.* at A212 (Sept. 7, 2022 Email from Counsel to NMS Labs).

[30] *See id.* at A270 (Proposed Expert Report of Andrew Ewens).

[31] *Id.* at A204–05 (Oct. 26, 2022 Email from Counsel to Delaware Division of Forensic Science).

[32] *Id.* at A373 (Curriculum Vitae of Andrew Ewens).

[33] *See id.* at A270–72 (Proposed Expert Report of Andrew Ewens).

10

opined that because NMS Labs tests for more bath salts analogues than the Division of Forensic Science, "not all of the potential drugs that may have been inside Mr. Wilkerson's body" on April 25 "are known."[34]  He further opined that "[w]ithout the testing of Mr. Wilkerson's blood by NMS [L]abs, the possibility of Mr. Wilkerson having consumed bath salts can[no]t be ruled out."[35]  Additionally, Wilkie Wilson, Ph.D., a faculty member at Duke University,[36] compared the effects of bath salts and other drugs, such as cocaine.  He opined that bath salts can be "ten times more potent than cocaine," and that bath salts users "can be like a runaway train with no way of stopping until a crash occurs."[37]

## C.

On March 24, 2023, the State filed a motion *in limine* to bar Wilkerson from presenting an involuntary intoxication defense and to exclude evidence related to it, including the private investigator's interview of Rooks, Dr. Ewens' proposed expert report, and Dr. Wilson's proposed expert report.[38]  The State argued that Wilkerson had no right to present an involuntary intoxication defense because "he voluntarily

---

[34] *See id.* at A269 (Proposed Expert Report of Andrew Ewens) ("The potential exists that additional drugs that were not looked for by the Delaware toxicology labs were also in Mr. Wilkerson's body.").

[35] *See id.* at A270 (Proposed Expert Report of Andrew Ewens).

[36] *See id.* at A402–03 (Curriculum Vitae of Wilkie Wilson).

[37] *See id.* at A312 (Proposed Expert Report of Wilkie Wilson).

[38] *Id.* at A170–94 (State's Motion *in Limine*).

11

took illegal drugs."[39]  The State alternatively argued that the proposed expert reports were not admissible under Delaware Rule of Evidence 702 and *Daubert*, and that the Rooks interview was not "some credible evidence" of involuntary intoxication, which was required under 11 *Del. C.* § 303 in order to present that defense.[40]  In response, Wilkerson contended that he had a due process right to present a complete defense.[41]  He acknowledged that Delaware courts had not decided whether involuntary intoxication was a legally viable defense under the facts of his case, but argued that he had the right to present evidence supporting the defense to the jury.[42]  He also argued that the expert opinions were admissible under Rule 702 and *Daubert*.[43]

After the parties agreed to forgo a hearing on the State's motion *in limine*,[44] the Superior Court published a memorandum opinion and order granting the motion (the "Opinion").[45]  The Opinion first addressed the threshold issue of whether Wilkerson, who voluntarily ingested illegal substances that may have differed from

---

[39] *Id.* at A186 (State's Motion *in Limine*).

[40] *Id.* at A188–93 (State's Motion *in Limine*).  The State submitted a rebuttal expert report with its motion *in limine*.  *See id.* at A314–19 (Proposed Rebuttal Expert Report of Christopher Holstege, M.D.).

[41] *Id.* at A328 (Wilkerson's Response to State's Motion *in Limine*).

[42] *Id.* at A336–37 (Wilkerson's Response to State's Motion *in Limine*).

[43] *Id.* at A337–38 (Wilkerson's Response to State's Motion *in Limine*).

[44] *See id.* at A449–50 (June 8, 2023 Teleconference Transcript).

[45] *See* Ex. B to Opening Br. [hereinafter *Superior Court Opinion*].

those that he intended to ingest, was precluded from presenting an involuntary intoxication defense as a matter of law.[46] In considering that issue, the court reviewed 11 *Del. C.* § 423 (setting out the involuntary intoxication defense); 11 *Del. C.* § 424 (defining "voluntary intoxication"); the 1973 Delaware Criminal Code with Commentary (the "1973 Commentary"); and cases from both Delaware and other jurisdictions.[47] Relying on these sources, the court precluded Wilkerson from presenting an involuntary intoxication defense as a matter of law because his conduct was voluntary, not involuntary.[48]

The court held in the alternative that the proffered expert opinions of Drs. Ewens and Wilson were inadmissible under Rule 702 and *Daubert*,[49] and that Wilkerson's other evidence (the Rooks interview) was not credible evidence and was therefore inadmissible.[50]

---

[46] *Id.* at 15 ("The issue squarely presented to me in this case is: if a defendant voluntarily ingests illegal drugs, and the illegal drugs were either different from the drugs the defendant thought he or she was taking, or were laced with additional substances, is the defendant entitled to present an involuntary intoxication defense as a matter of law?").

[47] *Id.* at 25. The court noted that Delaware courts had not previously decided the issue.

[48] *Id.* ("I hold that, as a matter of Delaware law, if a defendant voluntarily ingests illegal drugs, and the illegal drugs were either different from the drugs the defendant thought he or she was taking, or were laced with additional substances, the defendant is not entitled to present an involuntary intoxication defense."). The court also held that precluding Wilkerson from presenting an involuntary intoxication defense did not deprive him of his constitutional due process rights. *Id.* at 32.

[49] *Id.* at 33–35.

[50] *Id.* at 35–37. As explained in our analysis below, we do not reach whether the Superior Court correctly applied Rule 702 and 11 *Del. C.* § 303 when it excluded Wilkerson's proffered evidence.

13

## D.

Left without the prospect of an involuntary intoxication defense, Wilkerson waived his right to a jury trial,[51] and the parties and the court moved forward with a stipulated-fact bench trial.[52] The Superior Court held a one-day bench trial on October 16, 2023. During trial, the court read the stipulated facts into the record,[53] played a body-worn-camera recording,[54] and then rendered its verdict.[55] The court found Wilkerson guilty on all sixteen counts.[56]

---

[51] App. to Opening Br. at A480 (Sept. 28, 2023 Stipulation of Waiver of Jury Trial).

[52] *Id.* at A9–10 (Superior Court Docket); *id.* at A482–83 (Oct. 12, 2023 Office Conference Transcript).

[53] *Id.* at A502–23 (Oct. 16, 2023 Trial Transcript); *id.* at A537–58 (Trial Stipulation of Facts).

[54] *Id.* at A524–26 (Oct. 16, 2023 Trial Transcript).

[55] *Id.* at A530–32 (Oct. 16, 2023 Trial Transcript).

[56] *Id.* at A559–60 (Oct. 16, 2023 Verdict Form). As further detailed in the Superior Court's Amended Sentencing Order, Wilkerson was found guilty on sixteen counts: murder first degree (two counts), assault first degree (two counts), burglary first degree (one count), possession of a deadly weapon during the commission of a felony (five counts), possession of a deadly weapon by a person prohibited (three counts), terroristic threatening (one count), assault third degree (one count), and offensive touching (one count). *See* Ex. A to Opening Br. (Jan. 30, 2024 Amended Sentencing Order).

On December 8, 2023, following a presentence investigation, the Superior Court sentenced Wilkerson[57] to two life sentences, plus 212 years and 30 days of incarceration.[58] Wilkerson appealed.

E.

On appeal, Wilkerson argues that the Superior Court erred in four ways. First, Wilkerson contends that the Superior Court erred in finding that the involuntary intoxication defense was legally unavailable under these facts because 11 *Del. C.* § 423 and the 1973 Commentary, together, unambiguously state that the defense is available when a defendant is unaware of the intoxicating nature of the substance taken.[59] Second, Wilkerson argues that the Superior Court misapplied 11 *Del. C.* § 303 when it employed that provision to exclude evidence.[60] Wilkerson contends that the Delaware Rules of Evidence, not 11 *Del. C.* § 303, govern the admissibility of evidence.[61] Third, Wilkerson claims that the Superior Court abused its discretion when it excluded the reports of Drs. Ewens and Wilson because its factual findings

---

[57] App to Opening Br. at A561–601 (Dec. 8, 2023 Sentencing Transcript). Subsequent to the sentencing hearing, the State filed two Notices of *Nolle Prosequi* on December 13, 2023. *See id.* at A602–03 (Notices of *Nolle Prosequi* for attempted murder first degree (one count) and possession of a deadly weapon during the commission of a felony (two counts)). After a teleconference on January 29, 2024, the court issued the operative Amended Sentencing Order on January 30, 2024. *See id.* at A604–06 (Jan. 29, 2024 Teleconference Transcript); Ex. A to Opening Br. (Jan. 30, 2024 Amended Sentencing Order).

[58] Ex. A to Opening Br. at 2–4 (Jan. 30, 2024 Amended Sentencing Order).

[59] Opening Br. at 40–41.

[60] *Id.* at 30.

[61] *Id.*

15

were wrong and irrelevant for Rule 702 and *Daubert*.[62] Fourth and finally, Wilkerson argues that the Superior Court violated his due process right to present a complete defense by excluding evidence supporting his involuntary intoxication defense at the pre-trial stage.[63] Instead, the court should have let the jury hear the evidence and then decided at the prayer conference whether the evidence was sufficient to instruct the jury on the defense.[64]

The State contends that the Superior Court correctly ruled that the involuntary intoxication defense is legally unavailable under these facts because Wilkerson was voluntarily intoxicated.[65] The State further contends that the Superior Court properly employed Rule 702 and 11 *Del. C.* § 303 to exclude Wilkerson's proffered evidence supporting his defense.[66] Lastly, the State argues that the Superior Court did not violate Wilkerson's constitutional right to present a complete defense.

---

[62] *Id.* at 45–46.

[63] *Id.* at 27.

[64] *Id.* at 27–28.

[65] Answering Br. at 26–28, 34.

[66] *Id.* at 38–47.

## II.

Issues of statutory interpretation are "purely legal."[67]  We therefore interpret the meaning of a statute *de novo*.[68]

## III.

We need only reach one issue on appeal:  whether a person who knowingly introduces an unlawful intoxicating substance into his or her body is precluded from presenting an involuntary intoxication defense when:  (a) the unlawful substance differs from the one that the person thought he or she was introducing, or (b) the effects of the unlawful substance differ from those that the person anticipated.  Based on the unambiguous statutory language, we answer that question in the affirmative. Wilkerson's arguments to the contrary, relying on the 1973 Commentary, are unavailing given the plain meaning of the statutory language.

---

[67] *State v. Baker*, 720 A.2d 1139, 1144 (Del. 1998) (quoting *Richardson v. State*, 673 A.2d 144, 145–46 (Del. 1996)).

[68] *Mills v. State*, 201 A.3d 1163, 1168 (Del. 2019) ("We have also held that . . . issues of statutory interpretation are reviewed *de novo*."); *Arnold v. State*, 49 A.3d 1180, 1183 (Del. 2012) ("This Court reviews questions of statutory interpretation *de novo*."); *Baker*, 720 A.2d at 1144 ("Statutory construction 'involves a purely legal interpretation,' and thus our standard of review is *de novo*." (quoting *Richardson*, 673 A.2d at 145–46)); *Patrick v. State*, 922 A.2d 415, 2007 WL 773387, at *2 (Del. Mar. 15, 2007) (TABLE) ("Because this issue of law involves statutory interpretations, our review is *de novo*.").

A.

When we interpret a statute, our goal "is to ascertain and give effect to the intent of the legislative body."[69] We "must first 'determine whether the statute is ambiguous.'"[70] If the statute is unambiguous, then "the plain meaning of the statutory language controls,"[71] and our sole function "is to enforce it according to its terms."[72] "Thus, if statutory text is unambiguous, this Court's role is limited to an application of the literal meaning of the statute's words."[73] Further, where "the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion."[74]

"The fact that the parties disagree about the meaning of the statute does not create ambiguity."[75] Instead, a statute is ambiguous if it is "reasonably susceptible to different interpretations, or if giving a literal interpretation to the words of the statute would lead to an unreasonable or absurd result that could not have been

---

[69] *Garrison v. Red Clay Consol. Sch. Dist.*, 3 A.3d 264, 267 (Del. 2010).

[70] *Wiggins v. State*, 227 A.3d 1062, 1066 (Del. 2020) (quoting *Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010)).

[71] *Chase Alexa, LLC*, 991 A.2d at 1151.

[72] *Arnold*, 49 A.3d at 1183 (internal quotation marks and citation omitted).

[73] *Id.*

[74] *Friends of H. Fletcher Brown Mansion v. City of Wilmington*, 34 A.3d 1055, 1059 (Del. 2011) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

[75] *Chase Alexa, LLC*, 991 A.2d at 1151.

18

intended by the legislature."[76]  We may "look behind the statutory language itself only if the statute is truly ambiguous."[77]

11 *Del. C.* § 423, titled "Involuntary intoxication as a defense," provides:

> In any prosecution for an offense it is a defense that, as a result of *intoxication which is not voluntary*, the actor at the time of the conduct lacked substantial capacity to appreciate the wrongfulness of the conduct or to perform a material element of the offense, or lacked sufficient willpower to choose whether the person would do the act or refrain from doing it.[78]

11 *Del. C.* § 424 defines both "intoxication" and "voluntary intoxication" as those terms are used in Section 423 and similar provisions.[79]  "Intoxication" is "the inability, resulting from the introduction of substances into the body, to exercise control over one's mental faculties."[80]  "Voluntary intoxication" is

> intoxication caused by substances which the actor knowingly introduces into the actor's body, the tendency of which to cause intoxication the actor knows or should know, unless the actor introduces them pursuant to medical advice or under such duress as would afford a defense to a prosecution for a criminal offense.[81]

---

[76] *Arnold*, 49 A.3d at 1183.

[77] *In re Port of Wilmington Gantry Crane Litig.*, 238 A.3d 921, 927 (Del. Super. 2020) (citing *Friends of H. Fletcher Brown Mansion*, 34 A.3d at 1059).

[78] 11 *Del. C.* § 423 (1972) (emphasis added).

[79] 11 *Del. C.* § 424 (1972) ("As used in §§ 421–423 of this title:  (1) 'Intoxication' means . . . .  (2) 'Voluntary intoxication' means . . . .").

[80] 11 *Del. C.* § 424(1).

[81] 11 *Del. C.* § 424(2).

The text of Section 423, considering the defined terms in Section 424, is unambiguous. Involuntary intoxication is available as a defense when the actor's intoxication is "not voluntary." That language in Section 423 necessarily incorporates the definition of "voluntary intoxication" in Section 424, which states that intoxication is voluntary when "the actor knowingly introduces" a substance "into the actor's body" and "the actor knows or should know" that the substance has "the tendency . . . to cause intoxication." In that circumstance, the actor is not entitled to present an involuntary intoxication defense because the actor's intoxication is voluntary. Based on the statute's plain text, we hold that a person who knowingly introduces an unlawful intoxicating substance into his or her body cannot present the involuntary intoxication defense unless the statutory exceptions apply.[82]

Section 423 is not reasonably susceptible to a different interpretation. Wilkerson argues that the 1973 Commentary, not the statute's plain text, makes clear that the statute applies if Wilkerson ingested bath salts thinking it was methamphetamine. The 1973 Commentary states in part that Section 423 "is meant to cover cases . . . in which [the actor] was unaware of the intoxicating nature of the

---

[82] Wilkerson did not argue to the Superior Court or this Court that any statutory exception applies to him.

20

substance taken."[83] We need not rely on the 1973 Commentary because the text of the statute is unambiguous—"the plain meaning of the statutory language controls,"[84] and our sole function "is to enforce it according to its terms."[85] Further, even if the 1973 Commentary could be read to endorse Wilkerson's view that Section 423 applies if he took bath salts instead of methamphetamine—and we do not agree that it does—"extrinsic evidence may not be used . . . to create an ambiguity" in an unambiguous provision.[86]

Additionally, the statute is unavailable for an actor who knowingly takes an unlawful intoxicating substance (such as methamphetamine) and experiences intoxicating effects that differ from those that the actor anticipated. Indeed, the definition of "intoxication" in Section 424 focuses on an actor's inability to exercise control over the actor's mental faculties due to introducing a substance into the

---

[83] Delaware Criminal Code with Commentary at 90 (1973) ("[Section 423] is meant to cover cases in which the actor is forced to take intoxicants, as well as cases in which [the] actor was unaware of the intoxicating nature of the substance taken.").

[84] *Chase Alexa, LLC*, 991 A.2d at 1151.

[85] *Arnold*, 49 A.3d at 1183 (internal quotation marks and citation omitted).

[86] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). For instance, this Court has stated that "[a] synopsis is a proper source for ascertaining legislative intent. But, as with other sources of the legislative history, the Court may only look to the synopsis if the Court finds that the statutory language is ambiguous and requires interpretation." *Bd. of Adjustment of Sussex Cnty. v. Verleysen*, 36 A.3d 326, 332 (Del. 2012). The same can be said here for the 1973 Commentary. *Cf.* Norman J. Singer & Shambie Singer, 2A *Sutherland Statutes and Statutory Construction* § 46:4 (7th ed.) (updated Nov. 2024) ("If a court does find that a statute is *not* clear and unambiguous, then it may look to a wide variety of intrinsic and extrinsic sources to discover the meaning of the legislative language." (emphasis added)).

actor's body; it does not discriminate based on the intensity of intoxicating effects. The relevant statutory provisions provide no cover where the actor knowingly took the unlawful intoxicating substance and experienced unanticipated effects.

Our reading does not lead to an absurd result, and Wilkerson does not argue to the contrary. Instead, Wilkerson contends only that the statute is unambiguous and supports his interpretation when read with the 1973 Commentary.[87] And Wilkerson objects to the Superior Court's policy rationale underlying its interpretation of 11 *Del. C.* § 423.[88] But we do not look to the 1973 Commentary or rely on the Superior Court's policy rationale in this decision. Because the statute is unambiguous, we read the words of the statute without regard to extraneous materials.[89]

## B.

Here, Wilkerson knowingly introduced an unlawful substance into his body that he believed was methamphetamine. He knew that methamphetamine causes intoxicating effects. That means he was properly precluded from presenting an involuntary intoxication defense. In this situation, it is not relevant whether the

---

[87] *See* Opening Br. at 41.

[88] *Id.* at 41–42.

[89] *Arnold*, 49 A.3d at 1183 ("[I]f statutory text is unambiguous, this Court's role is limited to an application of the literal meaning of the statute's words."); *Friends of H Fletcher Brown Mansion*, 34 A.3d at 1059 ("[W]here the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.")

methamphetamine was in fact bath salts, nor is it relevant whether the effects differed from those that Wilkerson anticipated. During his birthday celebration, Wilkerson became voluntarily intoxicated, and that "is no defense to any criminal charge."[90]

Because Wilkerson could not present an involuntary intoxication defense, we do not reach the Superior Court's alternative rulings under Rule 702 and 11 *Del. C.* § 303 on the evidence supporting that defense.[91] We note, however, that because the involuntary intoxication defense was unavailable to Wilkerson as a matter of law, the Superior Court's ruling *in limine* did not deprive him of his constitutional right to present a complete defense.[92]

---

[90] 11 *Del. C.* § 421 (1976).

[91] We do not reach the Superior Court's interpretation and use of 11 *Del. C.* § 303 to exclude evidence. Wilkerson was precluded, as a matter of law, from asserting the involuntary intoxication defense. That preclusion is dispositive here.

[92] In his Opening Brief, Wilkerson focused his due process argument on the Superior Court's exclusion of his proffered evidence. *See* Opening Br. at 27–28 ("The trial court should have admitted the evidence, then heard application as to whether Mr. Wilkerson's jury would be instructed on involuntary intoxication. But the [Superior] Court's ruling on the State's motion short-circuited that process, to the derogation of Mr. Wilkerson's rights."). As an initial matter, "the defense does not have an unfettered right to present any evidence it wishes." *Burrell v. State*, --A.3d--, 2024 WL 4929021, at *10 (Del. Dec. 2, 2024). Instead, "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses and undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986) (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Regardless, because our decision rests on the unavailability of the defense as a matter of law under these facts, rather than the trial court's evidentiary rulings, Wilkerson's constitutional right to present a complete defense is not implicated. At oral argument, Wilkerson's counsel was asked whether he was disputing the point that if a proffered defense is legally unavailable, then it is not a due process violation to grant a motion *in limie* to prevent a defendant from presenting a legally unavailable defense. He responded that he was not disputing that. *See Oral Argument* at 1:30–2:20; *see also* Del. Super.

This decision forecloses presenting an involuntary intoxication defense in a specific factual scenario—where the actor knowingly introduces one unlawful intoxicating substance that may in fact be a different unlawful intoxicating substance, or where the intoxicating effects of the unlawful substance that the actor knowingly introduced differ from those that the actor anticipated.

This decision does not decide similar, but potentially distinct, questions. For instance, whether an actor is entitled to present an involuntary intoxication defense when the actor introduces an unlawful substance into his or her body but reasonably believed he or she was introducing a lawful substance, or when the unlawful substance was placed into a lawful substance without the actor's knowledge. Certain jurisdictions' common law has evolved to permit the defense in those situations.[93] We are aware of those evolutions, but none of those issues are before us today.

---

Ct. Crim. R. 12(b) ("Any defense . . . which is capable of determination without the trial of the general issue may be raised before trial by motion.").

[93] For instance, in *People v. Velez*, a California appellate court concluded that the defendant was not entitled to present the involuntary intoxication defense when the defendant smoked marijuana, which was illegal in California at the time, containing PCP and then assaulted a person. 221 Cal. Rptr. 631, 632–33 (Cal. Ct. App. 1985). But that court also noted that California courts "have allowed the defense of involuntary intoxication based on the ingestion of an unlawful drug where the defendant reasonably believed he was consuming a lawful substance or where the unlawful drug was placed without the defendant's knowledge *in a lawful substance*." *Id.* at 638–39 (emphasis in original) (collecting cases). The court in *Velez* recognized such a distinction because "it is common knowledge that unlawful street drugs do not come with warranties of purity or quality associated with lawfully acquired drugs such as alcohol. Thus, unlike alcohol, unlawful street drugs are frequently not the substance they purport to be or are contaminated with other substances not apparent to the naked eye." *Id.* at 637–38. Other courts appear to draw similar distinctions. *See, e.g.*, *People v. McMillen*, 961 N.E.2d 400, 407 (Ill. App. Ct. 2011) ("Illinois law

24

IV.

We AFFIRM the judgment of the Superior Court insofar as Wilkerson could

not assert the involuntary intoxication defense as a matter of law.

---

does not allow the involuntary intoxication defense where an individual voluntarily ingested an illegal drug."); *State v. Sette*, 611 A.2d 1129, 1139 (N.J. Super. Ct. App. Div. 1992) ("The involuntary intoxication defense has been rejected systematically where any part of the intoxication resulted from voluntary use of illegal drugs or of legal intoxicants for which the defendant had a known intolerance."); *State v. McClenton*, 781 N.W.2d 181, 192 (Minn. Ct. App. 2010) ("[W]e hold that a defendant who voluntarily smokes marijuana, which unbeknownst to him is laced with some other controlled substance, is not entitled to an involuntary-intoxication defense based on the resultant effects of the combined substances."); *United States v. Bindley*, 157 F.3d 1235, 1243 (10th Cir. 1998) (interpreting Kansas law and holding that the defendant "cannot argue involuntary intoxication because, by voluntarily choosing to smoke the marijuana cigarette, any resulting intoxication (whatever that may have been) was likewise voluntary"). *But see State v. Bigelow*, 931 N.W.2d 842, 849 (Neb. 2019) ("As the [trial court] noted, there was evidence in this case of both voluntary intoxication, caused by [the defendant]'s use of methamphetamine, and involuntary intoxication, caused by the three drugs given to him [later] at the hospital. The court therefore gave an intoxication instruction that addressed both voluntary and involuntary intoxication. We agree with the [trial court] and [intermediate appellate court] that an intoxication instruction was warranted by the evidence.").